**IN THE UNITED DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| |
|---|
| JOHN DOE,<br><br>                              Plaintiff,<br><br>v.<br><br>HILLSBOROUGH TOWNSHIP BOARD OF EDUCATION, HILLSBOROUGH TOWNSHIP POLICE DEPARTMENT, HILLSBOROUGH EDUCATION ASSOCIATION, JEAN TRUJILLO, in her official and individual capacity, GREGORY GILLETTE, in his official and individual capacity, HENRY GOODHUE, in his individual and official capacity, AMY SALINGER, in her individual and official capacity, AIMAN MAHMOUD, in his individual and official capacity, LISA ANTUNES, in her individual and official capacity, KIM FELTRE, in her individual and official capacity, MIKE CALLAHAN, in his individual and official capacity, DAVE FISHER, in his individual and official capacity, THOMAS M. MCLAIN in his individual and official capacity, and MIKE MCMAHON in his individual and official capacity,<br><br>                              Defendants. |

Case No.

**COMPLAINT**

Plaintiff, by way of Complaint against Defendants, says:

**SUMMARY OF CASE**

In April 2021, Plaintiff, a resident of Hillsborough Township, began sending       email communications to members of the publicly-elected Hillsborough Township Board of Education ("HTBOE") and Hillsborough Education Association ("HEA") expressing concern over the

1

clandestine implementation of a "detracking" policy by senior Administration officials in the Hillsborough Township School District ("HTSD"). Plaintiff's concern was twofold: (1) to notify HTBOE members of the HTSD Administration's illicit conduct in implementing their detracking policy, and (2) to dissent from HTSD Administration's detracking policy.

Plaintiff utilized a pseudonym for a number of reasons, including to protect his sources of information within the school district as well as to insulate his wholly-uninvolved spouse, who is coincidentally an HTSD employee.

In his emails, Plaintiff was respectful. He included citations to academic papers and links to publicly available information. He never used any abusive language or engaged in threats or ad hominem attacks. The Plaintiff's communications were that of a model citizen.

The Plaintiff sent multiple emails for dozens of legitimate reasons, including that he could not tell if the intended recipients were even receiving or seeing the messages.

The Plaintiff sent the messages to the best individual email address that he could find on the Web for each recipient. No intended recipient ever provided Plaintiff with their preferable individual email address.

The Plaintiff's messages concerned an important matter of public concern: public education policy. Yet, Plaintiff did not receive a single response from any of the recipients. That remains true to this day.

After over 1.5 months of trying to reach school officials, Plaintiff received a threatening email from HTSD's Business Administrator advising him that school officials were pursuing a criminal complaint against him. Plaintiff immediately replied promising that he would cease sending emails to HTBOE because the messages were apparently being received and were apparently unwelcome. Despite his promise, the Hillsborough Township Police Department

("HTPD") at the direction of HTSD Administration, HTBOE, HEA officials, opened a criminal investigation.

During their investigation, police were provided copies of some Plaintiff emails and interviewed the recipients, all of which demonstrated that Plaintiff has respectfully communicated with school officials regarding a matter of public concern. Yet, despite the lack of any evidence that a crime had been committed, HTPD continued pursuing its investigation eventually uncovering the Plaintiff's identity. Plaintiff was forced to engage counsel and devote hundreds of hours to his defense.

Once identified, HTPD interrogated Plaintiff despite having no evidence that he had committed a crime. Plaintiff explained why he had sent the email communications and how he located the recipients' individual email addresses through an internet search engine. He further explained that he could not tell if the intended recipients had seen or even received the messages because they did not respond. During the interrogation, the police officer asked Plaintiff a series of embarrassing personal questions. After the HTPD interrogation concluded, HTPD did not even have a reasonable suspicion, let alone probable cause, that a crime had been committed.

HTPD also disclosed to HTBOE and HTSD Administration officials the Plaintiff's identity, despite the absence of any evidence that a crime had been committed, for no legitimate reason at all.

HTSD Administration officials then predictably pursued an unwarranted investigation into Plaintiff's wholly-uninvolved spouse, which included calling her into a meeting during the school day to interrogate her. This interrogation embarrassed Plaintiff's spouse before her peers and was carried out for the sole purpose of punishing Plaintiff.

After the investigation was completed, and still without probable cause, the Hillsborough Township Police Department issued a Complaint against Plaintiff for harassment under *N.J.S.A.* 2C:33-4(a) by sending numerous emails to victims in a manner likely to cause annoyance despite knowing that the emails were not sent with the intention to harass. In response, Plaintiff filed a motion to dismiss the Complaint, which was opposed by the municipal prosecutor.

On April 12, 2022, the Honorable Francesco Taddeo, J.M.C. held a hearing regarding the merits of the complaint. Without hearing from any witnesses, Judge Taddeo found that the State could not meet its burden of proof supporting the elements of harassment and entered a verdict of "not guilty".

Since receiving HTSD's threatening response to his emails, Plaintiff has continued to suffer from symptoms of severe anxiety arising directly from Defendants' violation of Plaintiff's privacy and civil rights and Defendants' pursuit of their criminal investigation and prosecution, as well as indirectly from HTPD Administration's employment abuse of Plaintiff's wholly-uninvolved spouse. Plaintiff's public participation and speech is thoroughly chilled.

From their initial response to Plaintiff's email communications, Defendants engaged in an orchestrated effort to retaliate against Plaintiff for engaging in constitutionally-protected activity – that is, communicating with local government officials on matters of public interest. Plaintiffs' activities are protected by the First Amendment to the United States Constitution   and   Article I, Sections 6 and 18 of the New Jersey Constitution. Despite the obvious legality of the Plaintiff's email messages, the Defendants maliciously pursued the Plaintiff, prosecuting him and abusing his wholly-uninvolved spouse. At each step of the hunt for and criminal prosecution of Plaintiff, Plaintiff pleaded with Defendants to stop, but they refused.

Defendants pursued the prosecution of Plaintiff without any evidence giving rise to probable cause. Probable cause exists when the circumstances are such as to warrant an ordinarily prudent individual in believing that an offense had been committed. *Brunson v. Affinity Fed. Credit Union,* 199 N.J. 381, 391 (2009). Under *N.J.S.A.* § 2C:33-4, "a person commits a petty disorderly person's offense if, with purpose to harass another, he . . . [m]akes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm . . . [or] [e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person."

The nature and content of the email communications clearly demonstrate that Plaintiff did not send them with the purpose to harass. It is undisputed that Plaintiff send email communications to HTBOE and HEA officials on a matter of public concern. These messages were respectful and did not contain any coarse language or attack the recipient. Even the recipients acknowledged to police that the emails were not mean, threatening, or disparaging in any way, and none of them said they feared for their safety. When HTSD Administration officials demanded that he stop sending these communications, Plaintiff stopped. Plaintiff willingly spoke to police regarding the communications to explain their purpose. The Plaintiff clearly did not violate the NJ State Harassment statute. Yet, despite all of this, Defendants moved forward with prosecuting the Plaintiff.

Defendants' conduct undoubtedly violated Plaintiff's right to free speech and to petition government officials. Plaintiff's free speech rights continue to be thoroughly chilled due to Defendants' actions as he fears future retaliation against himself and his spouse should he again contact the School Defendants, or again, speak out against any HTSD policy.

**JURISDICTION AND VENUE**

2.      The Court has jurisdiction over this case under 28 U.S.C. § 1331. The Plaintiff is asserting claim arising under 42 U.S. Code §§ 1983.

3.      The Court has supplemental jurisdiction over the Plaintiff's state law claims under 28 U.S.C. § 1367.

4.      Venue is proper under 28 U.S.C. § 1391(b)(1)-(2) and 28 U.S.C. § 1391(c) because the Defendants reside in New Jersey and some or all of the events giving rise to these claims arose in New Jersey.

**PARTIES**

5.      At all relevant times, Plaintiff was a resident of Hillsborough Township, New Jersey. He is a member of the public, a taxpayer, a parent, a voter, and a constituent of the local public school system HTSD.

6.      Defendant, Hillsborough Township Board of Education ("HTBOE"), is a district board of education formed pursuant to *N.J.S.A.* 18A:10-1 with offices located in Hillsborough Township, New Jersey.

7.      HTBOE is a government oversight entity whose role is to represent the public in setting policy for, and overseeing the operation of the public school system.

8.      HTBOE is comprised of nine members elected by the Public to serve three-year terms.

9.      HTBOE sets policy and oversees the fiscal and educational operation of the Hillsborough Township School District ("HTSD").

10.     HTBOE also performs other functions such as conducting collective bargaining negotiations with HEA via the HTBOE's Human Resource Committee.

11.     In 2021 and 2022, the members of HTBOE included Defendants, Jean Trujillo ("Trujillo") and Gregory Gillette ("Gillette" and collectively with HTBOE and Trujillo, the "HTBOE Defendants").

12.     Trujillo served as the president of HTBOE in 2021.

13.     Trujillo was also a member of the HTBOE Human Resource Committee that conducts collective bargaining negotiations with HEA.

14.     Trujillo was also a member of the HTBOE Education Committee.

15.     Gillette was the HTBOE's Township Liaison.

16.     HTSD is a comprehensive community public school district that serves students in pre-kindergarten through twelfth grade in Hillsborough Township, Somerset County, New Jersey.

17.     HTBOE oversees HTSD in large part by appointment of and oversight over the HTSD superintendent, who is the highest officer in the HTSD Administration.

18.     The superintendent oversees the district's day-to-day operations and a business administrator to supervise the business functions of the district.

19.     Defendant, Lisa Antunes ("Antunes"), served as superintendent of HTSD from October 2020 to April 2022.

20.     The superintendent is responsible for leading HTSD's implementation of the policies set by the HTBOE.

21.     The Superintendent is not a member of HTBOE.

22.     Beginning in 2019, Defendant, Kim Feltre ("Feltre"), served as Assistant Superintendent for Curriculum and Instruction for HTSD.

23.     In December 2021, Feltre became Acting Superintendent of Schools for HTSD after Antunes was placed on leave, a position in which she served for the remainder of the 2021-2022 school year.

24.     Defendant, Aiman Mahmoud ("Mahmoud"), served as both the Business Administrator for HTSD and Secretary of HTBOE from 2008 until his resignation in December 2021.

25.     Mahmoud reported directly to the HTSD superintendent.

26.     Mahmoud's dual role as both the HTDS Business Administrator and HTBOE Secretary gives rise to an obvious conflict-of-interest when members of the public such as Plaintiff attempt to contact members of the HTBOE to report the misconduct of the Superintendent and members of Superintendent's Office.

27.     Defendant, Mike Callahan ("Callahan" and collectively with HTSD, Antunes, Feltre, and Mahmoud, the "HTSD Administration Defendants") served as VP of Human Resources for HTSD until sometime before June 2023.

28.     Hillsborough Education Association ("HEA") is the public sector labor union that represents most personnel employed in HTSD by HTBOE for the purpose of collective negotiations concerning the terms and conditions of employment.

29.     Defendant, Henry Goodhue ("Goodhue"), has served as the president of HEA since 2014.

30.     Defendant, Amy Salinger ("Salinger" and collectively with Goodhue and HEA, the "HEA Defendants", and collectively with the HTBOE Defendants and HTSD Defendants, the "School Defendants") was the treasurer of HEA in 2021 and 2022.

31.     Salinger is also a teacher at HTSD.

32.     Defendant, Hillsborough Township Police Department ("HTPD"), is municipal police department formed pursuant to *N.J.S.A.* 40A:14-118 with offices located at 379 South Branch Road, Hillsborough Township, New Jersey.

33.     Since 2020, Defendant, Dave Fisher ("Captain Fisher"), has served as a Captain in the HTPD.

34.     As captain, all of the HTPD division commanders report to Captain Fisher.

35.     Defendant, Thomas M. McLain ("Lt. McLain"), was formerly a detective sergeant in and is currently the commander of the Investigative Division in the HTPD.

36.     In February 2023, McLain was promoted to Lieutenant.

37.     As commander of the Investigative Division, Lt. McLain reports directly to Captain Fisher.

38.     Defendant, Mike McMahon ("Chief McMahon" and collectively with Captain Fisher, Lt. McLain, and HTPD, the "HTPD Defendants") was Chief of the HTPD from August 2019 through 2023.

39.     Captain Fisher reports to Chief McMahon.

## FACTS

**A.     The Debate Over Tracking in Public Schools.**

40.     Tracking, also known as leveling, is an education policy by which a school district attempts to group students into classes, based on test scores or previous coursework or other achievement measures, in order to match to curriculum as embodied in courses.

41.     Generally, in a tracking system, students are separated by academic achievement into groups for all subjects or certain classes and curriculum within a school.

42.     Tracking, and its various modifications, are among the predominant organizing practices of American public schools and have been an accepted feature of the country's schools for nearly a century.

43.     For decades, educators and policymakers have debated the merits of tracking.

44.     Starting in the 1980s, some school districts began to adopt detracking.

45.     While it can take many forms, "detracking" generally means commingling students with mixed academic achievement in the same classes, with the intention of exposing all students to the same curriculum, materials, and teaching.

46.     Supporters of detracking say tracking stigmatizes children and exacerbates racial and economic achievement gaps.

47.     Proponents of tracking argue that placing students with a wide range of achievement in the same class places educators in the difficult position of balancing the needs of students with varying abilities and learning differences. Under these circumstances, educators can only vary so much the pacing of their lessons and the depth at which they explore particular subjects, undermining differentiated learning and forcing them to choose between leaving behind struggling students or stunting the educational development of more advanced students   .

48.     In 2020, a nationwide conversation regarding racial equity led public officials to explore reforms in many areas of American life including policing, business, housing, the arts, and education.

49.     In education, many school districts expressed a renewed interest in detracking.

50.     A public school's policy with respect to its tracking policy is a matter of public concern.

**B.      Plaintiff Notifies the HTBOE and HEA Defendants of the Implementation of Detracking.**

51.     Before 2021, the HTSD began to implement "detracking," in district schools.

52.     Although HTBOE had not officially adopted a detracking policy, Antunes and Feltre had already begun to implement detracking within HTSD schools.

53.     Antunes and Feltre purposefully required and coached members of HTSD administration to refer to detracking as a "practice", not as a policy.

54.     The chief reason Antunes and Feltre required members of HTSD Administration to refer to detracking as a "practice" was so that detracking could be implemented under the radar without requiring disclosure to, or approval from, the elected HTBOE or the public.

55.     Plaintiff learned of Antunes' and Feltre's efforts to quietly implement detracking in HTSD schools through anonymous sources in HTSD administration, affected parents in the Hillsborough community, interested community leaders, online postings, and other sources.

56.     On or about April 28, 2021, Plaintiff began reaching out by email to HTBOE members, particularly Trujillo and Gillette, to inform them of Feltre's unauthorized, clandestine implementation of detracking in HTSD schools and further persuade them that detracking was not in the best interest of HTSD students, the school district, and the town at large.

57.     The intent of Plaintiff's messages to the HTBOE was both to blow the whistle on Antunes' and Feltre's illicit conduct in implementing detracking policy, as well as to prompt an investigation by HTBOE.

58.     Plaintiff sent the email communications from an email account he created on Gmail (the "KDG Account") using a pseudonym, Kirsten Diana Glampers ("KDG").The pseudonym was purposely chosen as it is similar to Diana Moon Glampers, the name of two different fictional character appearing in Kurt Vonnegut's stories. For the purposes of the emails, the name

11

specifically references the character in the short story, "Harrison Bergeron".  In that story, Diana Moon Glampers is the Handicapper General of the United States responsible for imposing regulations impairing the physical and mental abilities of higher-performing citizens in order to ensure that the output of all citizens is absolutely equal.

59.     Opponents of "detracking" frequently cite to this short story in the public debate.

60.     Plaintiff used a pseudonym for multiple, legitimate reasons, including to protect the sources that provided Plaintiff with information concerning the unofficial detracking policy and out of fear that HTSD administrators would retaliate against his wholly-uninvolved spouse should they learn the Plaintiff's identity.

61.     Plaintiff had voluntarily disclosed to all message recipients that he had to remain anonymous because he (correctly) feared retaliation by HTSD Administration.

62.     At that time, HTBOE members did not have official email addresses listed on the HTBOE website, unlike school board members of neighboring school districts.

63.     Plaintiff sent the email communications to publicly available individual email addresses that he found using an internet search engine.

64.     Plaintiff avoided, where possible, sending correspondence to email addresses administered by HTSD out of fear that these messages would be intercepted, read, and/or blocked by Antunes and Feltre and other HTSD Administration staff.

65.     Plaintiff attached to some of his email communications academic papers that presented a balanced examination of detracking.

66.     None of the email communications sent to the members of HTBOE and HEA contained any insults, threats, hostile language, invasive statements, hate speech, or obscene language.

67.     In fact, Plaintiff's email messages were written in a professional, respectful, and complimentary manner,     and were properly directed to the correct government oversight entity (HTBOE) that is legally chartered with overseeing the conduct of HTSD administrators.

68.     Plaintiff directed many of his emails to Trujillo because Trujillo was president of HTBOE and had claimed during her election campaign that she welcomed anonymous, unfiltered, written feedback from citizens and HTPS staff.

69.     In a candidate profile published by the League of Women Voters on October 30, 2019, Trujillo acknowledged that Trujillo knows it is not easy to share ideas with HTBOE unless you know a member personally, feel comfortable speaking at a public meeting, or feel comfortable emailing members with one's legal name.

70.     In the Candidate Profile, Trujillo proposed creating an anonymous, online feedback form where anyone can share their ideas with HTBOE.

71.     Trujillo also promised to acknowledge receipt of, and respond via email to, any feedback she received from the public.

72.     Despite winning her election, Trujillo had not created the anonymous feedback form proposed by Trujillo.

73.     Trujillo never responded to or even acknowledged that she had received any of Plaintiff's messages.

74.     Plaintiff also sent emails to HEA officials, Goodhue and Salinger, for numerous reasons, including:

        a.      As union officials, Goodhue and Salinger had an interest in and would make public Feltre's efforts to implement detracking as it was being undertaken without the input of district educators;

13

b.       HEA officials had existing relationships and communication channels with all the key HTBOE and HTSD constituents (HTBOE, HTSD Administration, HTSD teachers, HEA union members, NJEA policy makers, and parents);

c.       HEA officials had publicly offered to leverage the HEA's existing relationships, communication channels, and platforms to partner with HTBOE and disseminate HTSD education information; and

d.       Plaintiff believed HEA officials would oppose detracking because it was damaging to student's education and to the school;

75.     From April through June 2021, Plaintiff sent numerous email communications to members of HTBOE and HEA.

76.     Many of the emails sent by Plaintiff were versions of previous email communications that he forwarded to the recipients.

77.     At no time did any recipient respond to Plaintiff's email communications

78.     As the recipients did not respond, Plaintiff could not confirm that the email communications were even reaching the intended recipients.

79.     At no time did any recipient request that Plaintiff direct his email messages to a different email address or use a different mode of communication.

80.     At no time did any recipient indicate to Plaintiff that the Plaintiff's messages were welcome or unwelcome.

**C.      HTSD Officials Threaten to Prosecute Plaintiff.**

81.     On or about June 16, 2021, after receiving no response to his email communications directed to individual HTBOE members and individual HEA Public Sector union officials,

Plaintiff reluctantly began sending email communications to the HTBOE's general email address (the "HTBOE Email Address").

82.     Unbeknownst to Plaintiff, certain HTSD Administration officials had access to the email communications that a member of the public sends to the HTBOE Email Address.

83.     On June 18, 2021, Mahmoud, in his role as the Business Administrator for HTSD, sent an email to the KDG Account (the "First HTSD Email").

84.     Upon information and belief, Mahmoud sent the First HTSD Email at the instruction of the other HTSD Administration Defendants, and with the approval of the HTBOE.

85.     In the First HTSD Email, Mahmoud accused KDG of engaging in criminal harassment and advised KDG that the HTSD Administration Defendants would file a criminal complaint against him.

86.     Mahmoud threatened to uncover KDG's real identity and demanded that he cease and desist from sending further email communications.

87.     Mahmoud copied Captain Fisher on the First HTSD Email.

88.     At the time Mahmoud sent the First HTSD Email, Captain Fisher's spouse had recently been promoted to school principal in an HTSD school.

89.     Upon information and belief, Mahmoud sent the First HTSD Email at the direction of the HTSD Administration Defendants, and with the approval of HTBOE.

90.     The First HTSD Email was the first substantive response that Plaintiff received to his email communications, albeit the response was not from any intended recipient.

91.     The First HTSD Email was the first email to intolerably invade someone's privacy.

92.     A member of the public such as Plaintiff had the right to speak and the right to petition the government for a redress of grievances, either anonymously and pseudonymously.

93.     That same day, Plaintiff responded to the First HTSD Email (the "Responding Email") explained to Mahmoud why his attempts to contact HTBOE and HEA officials did not constitute criminal harassment, but promised to cease his email communications anyway because apparently recipients had received Plaintiff's messages, and did not welcome Plaintiff's insight.

94.     True to his word, Plaintiff did not send any further email communications regarding detracking to HTBOE and HEA officials.

95.     Despite Plaintiff's promise to cease communicating with HTBOE and HEA representatives by email, Mahmoud replied to the Responding Email that same day advising Plaintiff that the HTSD Administration Defendants still intended to dox and prosecute him.

96.     In his response to the Responding Email, Mahmoud doubled down writing "you are in fact committing a crime. . . . Once they identify you, you can explain your position and your interpretation of the law to the prosecutor."

97.     Following the email exchange, Plaintiff feared the adverse effects that the criminal investigation would have on his personal and professional life and that of his wholly-uninvolved spouse.

98.     Plaintiff began suffering from severe anxiety which manifested in a number of physical symptoms including, but not limited to, difficulty sleeping, panic attacks, lack of concentration, headaches, nausea, and feelings of dread from formerly ordinary events. Plaintiff continues to suffer from these ailments to this day.

99.     On June 24, 2021, Plaintiff, writing as KDG, sent another email correspondence (the "June 24th Email") to Mahmoud explaining to him in detail the severe anxiety and health failures he was suffering as a result of Mahmoud's threats, requesting that he keep private these

ailments, and pleading for HTBOE and HTSD to cease their efforts to unmask KDG and prosecute him.

100.    Mahmoud did not respond to Plaintiff's June 24th Email.

101.    Instead, Mahmoud forwarded June 24th Email to Captain Fisher where it was later disclosed to HTBOE members, HTSD Administration, and HEA officers, including coworkers of Plaintiff's wholly-uninvolved spouse.

### D.    HTPD's Opens an Investigation into the Harassment Allegations.

102.    On or about June 21, 2021, Captain Fisher assigned Lt. McLain to investigate the harassment allegations made by the HTSD Administration Defendants against Plaintiff.

103.    Upon information and belief, HTPD and Captain Fisher opened the investigation at the direction, encouragement, and/or insistence of the HTSD Administration Defendants and HTBOE members.

104.    As part of his investigation, Lt. McLain reviewed the email correspondence between Mahmoud and Plaintiff exchanged on June 18, 2021 and interviewed HTBOE Human Resources Director, Michael Callahan, and HTBOE Assistant Business Administrator, Ashley Sanguiliano.

105.    During his interview, Callahan advised Lt. McLain that the HTSD Administration Defendants believed the name Kirsten Diana Glampers was fictitious. Callahan's observation was superfluous, because the Plaintiff had already volunteered this in his email messages.

106.    Callahan believed the Plaintiff's pseudonym was a reference to a character in a Kurt Vonnegut short story whose role was to ensure everyone is held to the same intelligence, beauty, and athletic ability.

107.    Callahan believed that the choice of this pseudonym was intentional as it relates to Plaintiff's perspective on the issue of detracking.

**E.    Plaintiff Formally Responds to the Harassment Allegations.**

108.    Fearing that Mahmoud might not abandon his threat to hunt down, identify, and prosecute Plaintiff, Plaintiff retained the law firm of McCusker, Anselmi, Rosen, and Carvelli, P.C. ("MARC") to represent him.

109.    Bruce S. Rosen, Esquire ("Rosen") of MARC sent a letter dated July 12, 2021 (the "July 12th Letter") to Mahmoud explaining that Plaintiff's communications directed to HTBOE officials related to a matter of public concern and are protected by the First Amendment to the United States Constitution, even if he was using a pseudonym.

110.    In the July 12th Letter, Rosen further advised Mahmoud that his threats to prosecute Plaintiff are inappropriate and clearly meant to interfere with and undermine Plaintiff's right of free speech.

111.    Rosen sent copies of the July 12th Letter to Captain Fisher and Michael H. Robertson, then Prosecutor for Somerset County, New Jersey

112.    The Rosen Letter effectively placed Defendants and the Somerset County Prosecutor's Office on notice that Plaintiff's communications constituted speech was protected by the First Amendment of the United States Constitution, and therefore, lawful.

113.    On July 13, 2021, Lt. McLain contacted Rosen by telephone and demanded that Rosen disclose the identity of his client. Rosen refused.

**F.    HTPD's Dogged Pursuit of Plaintiff.**

114.    Despite Rosen's letter, HTPD continued to pursue its investigation to discover KDG's true identity and prosecute Plaintiff.

18

115.     On July 21, 2021, Lt. McLain interviewed Trujillo, Goodhue, Salinger, and Gillette.

116.     During their interviews, Trujillo, Goodhue, Salinger, and Gillette all acknowledged that Plaintiff's email communications were not mean, threatening, or disparaging in any way and none of them told Lt. McLain that they feared for their safety.

117.     Captain Fisher also assigned Detective David M. Brown ("Detective Brown") to assist Lt. McClain in serving subpoenas on internet companies in order to uncover the identity of KDG.

118.     With the assistance of the Somerset County Prosecutor's Office, on July 9, 2022, Officer Brown obtained a subpoena with a non-disclosure order (the "Google Subpoena") commanding Google, Inc. to produce certain information relating to email address, kglampers@gmail.com.

119.     On July 19, 2021, HTPD served the Google Subpoena on Google, which operates Gmail, demanding the production of certain records relating to the KDG Account.

120.     The nondisclosure order attached to the Google Subpoena prohibited Google from directly or indirectly revealing the existence of the subpoena to Plaintiff.

121.     In responses to the Google Subpoena, Google provided HTPD with a list of IP addresses associated with the KDG Account (the "IP Addresses").

122.     Using the IP Addresses, Detective Brown performed an internet search to determine the owners of the IP Addresses.

123.     With further assistance from the Somerset County Prosecutor's Office, on July 26, 2021, Detective Brown began obtaining NDO subpoenas (the "ISP Subpoenas") directed to the internet service providers that owned the IP Addresses -- Verizon, Comcast, AT&T, and Optimum – commanding them to produce certain records relating to ownership and use of the IP Addresses.

124.    The nondisclosure order (NDO) attached to the ISP Subpoenas prohibited the ISPs from directly or indirectly revealing the existence of the subpoena to Plaintiff.

125.    In a letter dated August 17, 2021 (the "Comcast Letter"), Comcast supplied Officer Brown with the name and residential address of the Plaintiff and his wholly-uninvolved spouse.

126.    After identifying the Plaintiff and his wholly-uninvolved spouse, HTPD performed further research and learned that Plaintiff's wholly-uninvolved spouse was an HTSD employee.

127.    On or about August 25, 2021, Lt. McLain spoke to Rosen by telephone and advised him that he had learned the identity of Rosen's client who he mistakenly believed to be Plaintiff's wholly-uninvolved spouse.

128.    During their call, Rosen disclosed Plaintiff's identity.

129.    On August 31, 2021, Lt. McLain conducted a telephone interrogation (the "Telephone Interrogation") with Plaintiff and Rosen.

130.    Before questioning Plaintiff, Lt. McLain required Plaintiff to acknowledge a Miranda warning, as though Plaintiff were a criminal.

131.    During the Telephone Interrogation, Plaintiff told Lt. McLain that he, and only he, wrote and sent the emails to HTBOE officials.

132.    Plaintiff explained that he believed that the new detracking policy is bad for HTSD students, the HTSD school, and the town.

133.    Plaintiff told Lt. McLain that Plaintiff's spouse was wholly-uninvolved and was unaware that he had sent the emails to HTBOE Defendants and HEA Defendants.

134.    Plaintiff told Lt. McLain that Plaintiff did not send a single email from the joint residence of Plaintiff and Plaintiff's wholly-uninvolved spouse.

135.    Plaintiff further explained why and how he found individual email addresses of HTBOE officials through internet searches

136.    Plaintiff further explained one of the many reasons for sending multiple email communications – that he was unsure if the HTBOE officials were actually receiving them since they were not responding.

137.    Plaintiff asked that Lt. McLain not release the Plaintiff's identity to anybody, including    Cpt. Fisher, HTPD chief McMahon, HTBOE, HTSD Administration, HEA, etc.

138.    Lt. McLain ignored Plaintiff's request.

139.    Lt. McLain also humiliated Plaintiff by asking him personal questions such as whether the anxiety arising from the criminal investigation was making it difficult for Plaintiff to be physically intimate with his spouse – a line of inquiry wholly unrelated to the investigation.

140.    Lt. McLain's words (" . . . is convincing me . . . he wrote these . . . that could change my response of what I am telling the Board . . . . I'd be less inclined to go to the Board of Ed and say, you know, "This is the name" . . . .) gave Plaintiff the false impression that McLain would not disclose Plaintiff's identity to put Plaintiff's wholly-uninvolved spouse in more jeopardy.

141.    Plaintiff insisted that Lt. McLain relay Plaintiff's objections to the HTPD chief (McMahon) who is the top decision-maker for the HTPD.

142.    HTPD Defendants disclosed the Plaintiff's identity to the other Defendants, despite the latter having no role in law enforcement.

143.    Despite Plaintiff's repeated affirmation that he and only he had sent the subject emails, the HTSD Administration Defendants pursued an unwarranted investigation into Plaintiff's wholly-uninvolved spouse's involvement including calling her into a meeting in the middle of the school day to interrogate her.

144.    The HTSD Administration Defendants did not carry out this interrogation for a legitimate school-related purpose – HTPD was responsible for carrying out the investigation – but solely for the purpose of punishing Plaintiff and his spouse.

145.    Despite having a contractual obligation to protect Plaintiff's spouse and ensure that HTSD followed agreed-upon protocol regarding meetings between HTSD administrators and HEA members, HEA abandoned Plaintiff's spouse.

146.    Teachers and other HTSD staff members inevitably learned about the interrogation session causing Plaintiff's spouse further trauma, stress, and humiliation.

**G.    Plaintiff Is Acquitted.**

147.    On or about September 27, 2021, at the direction of Chief McMahon and Captain Fisher, Lt. McLain issued a Complaint with a Notice to Appear at the Hillsborough Municipal Court on October 5, 2021 to answer to a charge that Plaintiff engaged in harassment under *N.J.S.A.* 2C:33-4(a) by "sending numerous emails to victims in a manner likely to cause annoyance."

148.    Plaintiff had not sent an email communication to any HTBOE member or HEA officer in more than three months at the time that Lt. McLain served Plaintiff with the Complaint.

149.    The matter was subsequently transferred from the Hillsborough Township Municipal Court to the Warren Township Municipal Court (the "Municipal Court") after the Hillsborough Township Municipal Prosecutor's disclosed his conflict of interest.

150.     Prior to the hearing, Rosen filed a motion in the Municipal Court to dismiss the single charge against Plaintiff, which was opposed by the municipal prosecutor.

151.    On April 12, 2022, the Honorable Francesco Taddeo, J.M.C. held a hearing regarding the merits of the case as the facts were largely uncontested.

152.    Without hearing from any witnesses, Judge Taddeo determined that the State could not meet its burden of proof supporting the elements of harassment under *N.J.S.A.* 2C:33-4.a. and entered a verdict of "not guilty".

153.    Even at the end of the investigation, HTSD filed the complaint against Plaintiff knowing that they lacked any evidence showing that the email communications posed a threat to any recipient's safety, or intolerably invaded any recipient's privacy, or that Plaintiff sent them with the purpose to harass.

### FIRST COUNT
### (Civil Rights Act of 1871 - 42 U.S.C. § 1983)
**(Liability of Trujillo, Gillette, Antunes, Feltre, Mahmoud, Callahan, Goodhue, and Salinger in Their Individual Capacities)**

154.    Plaintiff repeats, realleges, and re-emphasizes the foregoing as if set forth in full herein.

155.    Plaintiff's email communications to the School Defendants constitutes constitutionally protected free speech.

156.    The School Defendants have conspired to deprive and have deprived Plaintiff of his rights to free speech and to petition the government secured by two clauses of the First Amendment of the United States Constitution by retaliating against Plaintiff through threatening and prosecuting Plaintiff without probable cause and for the purpose of deterring Plaintiff's speech.

157.    The School Defendants, at all times and in all events relevant hereto, have acted under the color of authority of the statutes of the State of New Jersey.

158.    The School Defendants' actions effectively chilled the exercise of the Plaintiff's First Amendment right and caused him to lose thousands of hours of his life, thousands of dollars, relationships, and suffer physical, mental, and emotional distress.

WHEREFORE, Plaintiff demands judgment against the School Defendants for nominative, compensatory, and punitive damages, injunctive relief, plus interest thereon, attorneys' fees and costs, and all other relief deemed just and proper by the Court.

## SECOND COUNT
### (Civil Rights Act of 1871 - 42 U.S.C. § 1983)
### (Policy and Practice of the Hillsborough Township Board of Education)

159.    Plaintiff repeats, realleges, and re-emphasizes the foregoing as if set forth in full herein.

160.    HTBOE has established a policy, practice, and/or custom of threatening and/or pursuing prosecution against citizens who contact the publicly-elected Board of Education or its members to notify them of the illicit conduct of HTSD officials, and/or oppose certain district policies established by HTSD Administration officials.

161.    HTBOE's conduct in threatening and prosecuting Plaintiff for exercising his First Amendment rights was approved by Antunes, Feltre, and members of the HTBOE, and they delegated their authority to HTSD officials Mahmoud and Callahan to threaten and pursue prosecution of the Plaintiff.

162.    As a direct result of this policy, practice, and/or custom and the exercise of their authority, HTBOE chilled the exercise of the Plaintiff's First Amendment rights and caused him to lose thousands of hours of his life, thousands of dollars, relationships, and suffer physical, mental, and emotional distress.

WHEREFORE, Plaintiff demands judgment against HTBOE for nominative, compensatory, and punitive damages, injunctive relief, plus interest thereon, attorneys' fees and costs, and all other relief deemed just and proper by the Court.

**THIRD COUNT**
**(Civil Rights Act of 1871 - 42 U.S.C. § 1983)**
**(Liability of Chief McMahon, Captain Fisher, and Lt. McLain in Their Individual Capacities)**

163.    Plaintiff repeats, realleges, and re-emphasizes the foregoing as if set forth at length herein.

164.    The Police Defendants, at all times and in all events relevant hereto, have acted under the color of authority of the statutes of the State of New Jersey.

165.    Captain Fisher and Lt. McLain conspired with the School Defendants to violate Plaintiff's right of free speech and right to privacy by uncovering Plaintiff's identity and prosecuting him without the requisite probable cause supporting the criminal charge of harassment.

166.    Captain Fisher and Lt. McLain engaged in their unlawful conduct in response to and in order to further deter the exercise of Plaintiff's rights to free speech and to petition the government secured by the First Amendment of the United States Constitution.

167.    The Police Defendants' actions effectively chilled the exercise of the Plaintiff's First Amendment rights and caused him to lose thousands of hours of his life, thousands of dollars, relationships, and suffer physical, mental, and emotional distress.

WHEREFORE, Plaintiff demands judgment against the Police Defendants for nominative, compensatory, and punitive damages, plus interest thereon, attorneys' fees and costs, and all other relief deemed just and proper by the Court.

**FOURTH COUNT**
**(Civil Rights Act of 1871 - 42 U.S.C. § 1983)**
**(Policy and Practice of the Hillsborough Township Police Department)**

168.    Plaintiff repeats, realleges, and re-emphasizes the foregoing as if set forth in full herein.

169.   HTPD has established a policy, practice, and/or custom of threatening and/or pursuing prosecution at the direction of school district and other local government officials against citizens who criticize government policies.

170.   HTPD's unlawful investigation and prosecution of Plaintiff for exercising his First Amendment rights was approved by the highest officer Chief McMahon, as well as Captain Fisher and other HTPD officials, and they delegated their authority to Lt. McLain and Cpl. Brown to pursue prosecution of the law-abiding Plaintiff.

171.   As a direct result of this policy, practice, and/or custom and the exercise of their authority, HTPD chilled the exercise of the Plaintiff's First Amendment rights and caused him to lose thousands of hours of his life, thousands of dollars, relationships, and suffer physical, mental, and emotional distress.

WHEREFORE, Plaintiff demands judgment against the Police Defendants for nominative, compensatory, and punitive damages, injunctive relief, plus interest thereon, attorneys' fees and costs, and all other relief deemed just and proper by the Court.

## FIFTH COUNT
### (New Jersey Civil Rights Act - *N.J.S.A.* 10:6-1 *et seq.*)
### (Liability of School Defendants)

172.   Plaintiff repeats, realleges, and re-emphasizes the foregoing as if set forth in full herein.

173.   The School Defendants interfered with Plaintiff's rights of free expression and to petition government officials by threatening to pursue and actually pursuing prosecution of Plaintiff for the exercise of his substantive rights.

174.    The School Defendants' actions effectively chilled the exercise of the Plaintiff's First Amendment right and caused him to lose thousands of hours of his life, thousands of dollars, relationships, and suffer physical, mental, and emotional distress.

WHEREFORE, Plaintiff demands judgment against the School Defendants for nominative, compensatory, and punitive damages, injunctive relief, plus interest thereon, attorneys' fees and costs, and all other relief deemed just and proper by the Court.

### SIXTH COUNT
**(New Jersey Civil Rights Act - *N.J.S.A.* 10:6-1 *et seq.*)**
**(Liability of Police Defendants)**

175.    Plaintiff repeats, realleges, and re-emphasizes the foregoing as if set forth in full herein.

176.    The Police Defendants interfered with Plaintiff's rights of free expression and to petition government officials for the redress of grievances by continuing to pursue prosecution of Plaintiff for the exercise of his substantive rights despite insufficient evidence giving rise to probable cause.

177.    The Police Defendants' actions effectively chilled the exercise of the Plaintiff's First Amendment right and caused him to lose thousands of hours of his life, thousands of dollars, relationships, and suffer physical, mental, and emotional distress.

WHEREFORE, Plaintiff demands judgment against the Police Defendants for nominative, compensatory, and punitive damages, injunctive relief, plus interest thereon, attorneys' fees and costs, and all other relief deemed just and proper by the Court.

Dated:                                    By:    */s/ Shawn D. Edwards*
                                                  Shawn D. Edwards, Esquire
                                                  Maselli Mills & Fornal, P.C.
                                                  400 Alexander Park, Suite 101
                                                  Princeton, New Jersey 08540
                                                  Tel: (609) 452-8411
                                                  Fax: (609) 452-8422
                                                  sedwards@masellilaw.com
                                                  *Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues.

Dated:                                    By:    */s/ Shawn D. Edwards*
                                                  Shawn D. Edwards, Esquire
                                                  Maselli Mills & Fornal, P.C.
                                                  400 Alexander Park, Suite 101
                                                  Princeton, New Jersey 08540
                                                  Tel: (609) 452-8411
                                                  Fax: (609) 452-8422
                                                  sedwards@masellilaw.com
                                                  *Attorneys for Plaintiff*